# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 1:15-cv-105-GZS |
| | ) | *SEALED* |
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR JUDGMENT

Before the Court are cross-motions for judgment by Defendant (ECF No. 32) and Plaintiff (ECF No. 33).  As explained herein, the Court GRANTS Defendant's Motion for Judgment on the Record (ECF No. 32) and DENIES Plaintiff's Motion for Judgment on the Record (ECF No. 33).

## I.   STANDARD OF REVIEW

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).  This "standard is not affected by the presence of cross-motions for summary judgment."  Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005) (citation omitted).  Even when filed simultaneously, "[c]ross-motions for summary judgment require the district court to consider each

motion separately, drawing all inferences in favor of each nonmoving party in turn." AJC Int'l, Inc. v. Triple–S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (internal quotations and citations omitted).

However, when a case challenges the denial of benefits under Employee Retirement Income Security Act of 1974 (ERISA), codified in relevant part at 29 U.S.C. §§ 1001–1461, cross-motions for summary judgment are "nothing more than vehicles for teeing up [the case] for decision on the administrative record." Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc., 813 F.3d 420, 425 (1st Cir. 2016); see also Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). With both sides' arguments queued up via cross-motions, the Court reviews the same record that was before the plan administrator and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 17–18 (1st Cir. 2002) (applying this standard when the parties moved for cross-summary judgment).

As the First Circuit explained in Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Associates Long Term Disability Plan, 705 F.3d 58 (1st Cir. 2013):

> Where, as here, the administrator of an ERISA plan is imbued with discretion in the interpretation and application of plan provisions, its use of that discretion must be accorded deference. It follows that judicial review is for abuse of discretion. In the ERISA context, this metric is equivalent to the familiar arbitrary and capricious standard. Whatever label is applied, the relevant standard asks whether a plan administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'

Id. at 61 (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002) with other citations omitted). "Evidence is deemed substantial when it is reasonably sufficient to support a conclusion." Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (citations and internal quotations omitted). Notably, when a plan administrator both evaluates and pays claims under a plan, there is an inherent conflict of interest. "This inherent conflict may be

weighed as a factor in assessing the reasonableness of [the plan administrator]'s decision, but its existence does not perforce alter [the] standard of review." Colby, 705 F.3d at 62 (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115, 117 (2008)).

With this standard in mind, the Court provides the factual recitation that follows, which is drawn from the parties' submissions of statements of material fact, and the responses thereto,[1] as well as the Court's review of those portions of the sealed Administrative Record ("AR") that the parties have cited to in these submissions.

## II.    FACTUAL RECORD

Plaintiff Jane Doe[2] was employed as an attorney at a law firm in Maine for more than twenty-five years. (Pl. SMF ¶ 3.)  She was an equity partner at the firm until August 2011. (Pl. SMF ¶ 1.)  After August 2011, Plaintiff remained employed as a non-equity partner until February 2012, when her employment terminated. (Pl. SMF ¶ 2.)  In 2010, Plaintiff had K-1 income of $175,913.00.   In 2011, Plaintiff's K-1 income dropped by approximately sixty-six percent ($116,249.00), yielding a total 2011 income of $59,664.00.  (Pl. SMF ¶ 28 & AR 391.)

### Plaintiff's Long-Term Disability ("LTD") Plan

Plaintiff was insured under a long-term disability plan offered by the Law Firm to employees. (Pl. SMF ¶ 4 & Def. SMF ¶ 2.)  The plan was fully insured by a long term disability

---

[1] Plaintiff's Statement of Material Fact (Pl. SMF) is located at ECF No. 33 at Page ID#s 126-40.  Defendant's Response to Pl. SMF is located at ECF No. 34-1.  Defendant's Statement of Material Facts (Def. SMF) is located at ECF No. 32-3.  Plaintiff's response to Def. SMF is located at ECF No. 35 at Page ID#s 156-157.

[2] "Jane Doe" is a pseudonym, which the Court has permitted Plaintiff to use in this litigation.  See 10/02/2015 Order (ECF No. 27).

policy[3] issued by Defendant Standard Insurance Company (also known as "The Standard"), which both determines eligibility for benefits under the Policy and pays the claims.  (Pl. SMF ¶¶ 5 & 6; Def. SMF ¶ 5.)  The Policy provides coverage for (1) any total disability that prevents the insured from performing her "Own Occupation" or (2) or "Partial Disability."  (Pl. SMF ¶ 5.)  The plan defines the term "Mental Disorder" to include "depression and depressive disorders." (Def. SMF ¶ 9 & AR 381.)  Benefits under the plan are subject to a 90-day Benefits Waiting Period, such that participants must be "continuously Disabled" for at least 90 days before any LTD benefits become payable.  (Def. SMF ¶ 7 & AR 363, 386.)

More specifically, as it relates to the pending dispute, the Policy provides the following material terms:

### *Definitions of Own Occupation and Partial Disability*

You are Disabled if you meet one of the following definitions during the period it applies:

    A.      Own Occupation Definition Of Disability; or
    B.      Partial Disability Definition.

**A. Own Occupation Definition Of Disability**
During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of … Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation.

\*\*\*

[The Specialty Language]
If you are an attorney at law and you have practiced law for at least 5 years, during the Benefit Waiting Period and through the Own Occupation period, we will consider your Own Occupation to be the one legal subject matter area or type of legal practice in which you specialize, provided you have earned at least 85% of your gross

---

[3] A copy of this group long term disability policy (the "Policy") is part of the Redacted Administrative Record, which is on file with the Clerk's Office.  (Def. SMF ¶ 4 & AR 359-389.)

professional service fee income in that area or type of practice during the 24 months immediately before you become Disabled.

**[B.]Partial Disability Definition**
During the Benefit Waiting Period and the Own Occupation Period, you are Partially Disabled when you work in your Own Occupation but, as a result of … Mental Disorder, you are unable to earn 80% or more of your Indexed Predisability Earnings, in that occupation.

*Definition of "Temporary Recovery"*
You may temporarily recover from your Disability and then become Disabled again from the same cause or causes without having to serve a new Benefit Waiting Period. Temporary Recovery means you cease to be Disabled for no longer than the applicable Allowable Period …

Allowable Periods [means]
1. During the Benefit Waiting Period: a total of 30 days of recovery.
2. During the Maximum Benefit Period: 180 days for each period of recovery.

If your Temporary Recovery does not exceed the Allowable Periods…[t]he Predisability Earnings used to determine your LTD Benefit will not change.

*Definition of "Predisability Earnings"*
[Y]our Predisability Earnings will be based on your Employer's prior tax year….Predisability Earnings means your average monthly compensation from your Employer during the Employer's prior tax year.

(Pl. SMF ¶ 12 & AR 369, 371-72 & 381.)

The Plan confers upon Standard "full and exclusive authority to control and manage the [plan], to administer claims, and to interpret the [plan] and resolve all questions arising in the administration, interpretation, and application of the [plan]." (Def. SMF ¶ 10 & AR 384.) It further provides that all of The Standard's decisions in the exercise of its authority are "conclusive and binding." (Def. SMF ¶ 11 & AR 384.) The Plan allows a participant to request a review of any part of a claim that is denied, and that review is to be conducted by someone other than the person who denied the original claim. (Def. SMF ¶ 12 & AR 383.) The participant must request any review "in writing" and "within 180 days after receiving notice" of the decision to be reviewed. (Def. SMF ¶ 13 & AR 383.)

Plaintiff had a "legal practice in which she specialized," meaning she had practiced law for more than five years and had a specific type of specialized legal practice (the "Specialty Own Occupation"). (Pl. SMF ¶¶ 7 & 8; AR 369.)

### Plaintiff's Disability

On November 30, 2011, Plaintiff appeared for a scheduled regular examination with her gynecologist, Kathleen Petersen, M.D. (Pl. SMF ¶ 13.) Dr. Petersen's contemporaneous November 30, 2011 record (the "11/30/11 Petersen Record") stated the following regarding Doe:

> She hopes she can "unload some concerns on me" . . . [O]ver the past year or so, she has become "bone crushingly exhausted." She does not have any interest in life. . . . She will fall asleep, but then wake up at 3 a.m., and "have a horrid time getting back to sleep. These last couple of months have been just awful for her. . . . She feels as though her husband is pressuring her to work more and earn more money. She feels as though nobody would miss her if she was gone . . . .

(Pl. SMF ¶ 14 & AR 520-21 (redacted).) Although Doe was resistant to advice that she seek counseling, Dr. Petersen increased her citalopram to 40 mg daily.[4] (Id. (redacted).)

On December 9, 2011, clinical psychologist Frederick White, Ph.D., first saw Doe. His records from this first visit (the "12/9/11 White Record") included the following notes: symptoms included pervasive sadness, depressed mood, fatigue, suicidal ideation ("SI"), decreasing self-esteem, increasing frequency of tearfulness; the onset of the symptoms had increased in the past year to the "tipping point;" the mental status report concluded "quite depressed" mood, decreased attention, concentration and memory, her appetite and weight were down, sleep was impaired but "most recently" she was experiencing hypersomnia, speech was slowed, she had suicidal ideation with means but "denies plan + intent presently," but "contract for safety" was also noted. (Pl. SMF ¶ 15 & AR 480-81 (redacted).) Dr. White diagnosed her with Major Depressive Disorder (ICD

---

[4] Doe had initially been prescribed citalopram, an antidepressant, at 20 mg daily in 2006. AR 520 & 561.

296.23) with a GAF score of 40.[5]  (Pl. SMF ¶ 16 & AR 481.)  In a letter to Standard Insurance

Company, dated May 22, 2013, Dr. White explained:

> Ms. [Doe] engaged my services beginning with her initial intake at my office on December 9, 2011. I can verify that her disability predates this initial session insofar as her call requesting to be seen for evaluation and treatment occurred early in November, 2011. Her report on interview during intake stated that she became aware of onset of symptoms no less than one year prior.

(Pl. SMF ¶ 18 & AR 466.)

Dr. White saw Doe again on December 12, 2011 and December 15, 2011, and provided an

assessment that Doe was having continuing mental disorder with suicidal ideation.  Doe and Dr.

White contracted for her safety.  (Pl. SMF ¶ 19 & AR 482 (redacted).)  On January 5, 2012, Dr.

White saw Doe after the holidays. She reported doing better during holidays and masking her

depression. She appeared better rested and her facial and posture were more upbeat. Her suicidal

risk continued to decrease. (Pl. SMF ¶ 20 & AR 482 (redacted).)[6]

Dr. Petersen also saw Doe on January 5, 2012 (the "1/5/12 Petersen Record") and noted

the following:

> Doe has seeing Dr. Fred White . . . . [Dr. White] did call me today.  [Dr. White] did see [Doe] today and states [Doe] has some suicidal ideation but no real plan or intent. [Dr. White] did not believe that [Doe] needed to be blue papered.
>
> I directly asked [Doe] if she was suicidal.  [Doe] stated that she had thought of just ending her pain. . . . She had thought rather vaguely of putting on her ice skates and skating out onto thin area of ice but states that she promised not to do that and would not.
> . . . .

---

[5] The Standard's consulting psychiatrist, Dr. Gwinnell, later described a GAF of 40 as "serious symptoms, and serious impairment in social, occupational, or school functioning."  Pl. SMF ¶17 & AR 469.

[6] The assertions contained in this paragraph are also supported by Dr. White's August 7, 2014 Sworn Statement (AR 78-79), which Plaintiff has cited in support of these factual assertions.  See Pl. SMF ¶¶ 19 & 20.  Because this document was not part of the materials considered by the plan administrator in reaching its decisions, the Court does not rely on the substance of Dr. White's 2014 Sworn Statement but acknowledges that it serves as an unredacted source of some relevant facts that the parties have redacted from the underlying medical records.  Compare AR 482 with AR 78-79.

> She has not told any of her children of her depression. . . . We talked at some length about family and support. [Doe] does actually have a planned trip[s] . . . to New York with one of her children and [another trip to Paris]. We talked about goals and good things in her life . . . .
>
> I directly asked her if she was going to hurt herself and she promised not to. . . . [S]he promised to keep her appointment next week, that she is not going to commit suicide.

(Pl. SMF ¶ 21; AR 518-519 (redacted).)   Dr. Petersen observed that Doe "is just severely depressed. I point blank asked her about hospitalization; she feels she cannot, that it would be a severe detriment to her practice. I have pointed out to her that if she committed suicide that would be much worse." (Pl. SMF ¶ 22 & AR 518 (redacted).)[7]

At appointments held on January 9 and 16, 2012, Plaintiff reported to Dr. White that her symptoms were continuing. Dr. White's documented assessment was continuing major depression with suicidal ideation decreasing. (Pl. SMF ¶ 23 & AR 482 (redacted).)

On January 18, 2012, Dr. Petersen saw Doe again and noted as follows (the "1/18/12 Petersen Record"): She continues to be dealing with her significant depression. She has been seeing Dr. Fred White at least once a week. She is continuing with [her medication]. She does think she is a little better in that she is not suicidal. She is not thinking about skating through the ice. she still feels "incompetent and catatonic." . . . She just has a lot of issues as far as her law firm and her income. She is judging herself. She is clearly quite insecure at this point. (Pl. SMF ¶ 24 & AR 517-516 (redacted).) Dr. Petersen encouraged Doe to go on planned trips with her children. (Id.)

---

[7] The assertions contained in this paragraph are also supported by Dr. Petersen's August 28, 2014 Declaration (AR 86-87), which Plaintiff has cited in support of these factual assertions. See Pl. SMF ¶¶ 21 & 24. Because this declaration was not part of the materials considered by the plan administrator in reaching its decisions, the Court does not rely on the substance of Dr. Petersen's 2014 Declaration but acknowledges that it serves as an unredacted source of some relevant facts that the parties have redacted from the underlying medical records. Compare AR 518-19 with AR 86-87.

On February 8, 2012, Plaintiff had her first visit since April 2011 with her primary care physician, Donna Conkling, M.D.  (Pl. SMF ¶ 26 & AR 551.)  Dr. Conkling's notes indicate: physical exam "postponed.  Patient is close to tears.  She appears anxious, depressed and exhausted." (AR 552.)  Plaintiff reported problems with: depression, anxiety, feelings of needing to cry, feelings of worthlessness, loss of joy in life, thoughts of hurting herself or others; "want[ed] to leave her job but not sure how."  (AR 551 & 555.)  "She is about to turn 65 . . . and her financial advisor has told her she can stop working at her firm if she chooses.   Her husband was not completely supportive of her stopping work."  (Pl. SMF ¶ 27 & AR 551 (redacted).)

Doe last logged any hours at work on January 27, 2012.  (AR 174.)

### Plaintiff's Initial Claim Submission

The Standard received notice of Doe's LTD claim on or about March 22, 2012. (Def. SMF ¶ 14 & AR 11.)  In support of her claim for benefits, Plaintiff submitted to Standard an Employee's Statement.[8]  (Pl. SMF ¶ 29 & AR 274-276.)  This Statement indicated that Doe's last full day at work was February 9, 2012.  Doe also reported in her Employee's Statement that she had suffered depression for approximately five years but became "unable to work" in her occupation as a result of her disability in October 2011 noting that "work exacerbated disability."[9]  (AR 274-75.)  She described her disability as "partial[ly]" work-related.  (AR 274 (redacted).)  In the section of the Employee's Statement where she was asked to list all illnesses that contributed to her being unable to work in her occupation, she listed:  "mental health, related disorders, stress related, emotional,

---

[8] It appears that Standard received an initial Employee's Statement from Doe on March 22, 2012 that was unsigned (AR 279-282) and then a later signed version (dated 3/30/12) of the Employee's Statement on April 3, 2012 (AR 274-275).  The Court references the signed version of the Employee Statement in its factual recitation.

[9] Defendant notes that the "October 2011" date was not included in Plaintiff's initial unsigned Employee's Statement. (Def. SMF ¶ 19 & AR 279.)

behavioral [and] psychological" and further indicated that she first noticed these illnesses "approximately 2-3 years" ago.  (AR 274.)  In response to the Employee's Statement prompt of "State what you believe caused your illness," Doe wrote:  "The confluence of work related stress [and] abuse coupled with family dysfunctional issues." (Def. SMF ¶ 17 & AR 274 (redacted).) She further described her symptoms as "unable to process or think clearly while at work or at home, chronic fatigue, upset stomach, migraine headaches, inability to function."  (Def. SMF ¶ 18 & AR 274.)

On February 9, 2012, Dr. Petersen completed The Standard's Attending Physician Statement ("APS") stating, "Patient is severely depressed and working to overcome suicidal ideation." (Pl. SMF ¶ 30 & AR 578, 580 (redacted).)  Dr. Petersen listed the date that she recommended that Doe stop working as February 9, 2012.  (AR 580.)  On February 10, 2012, Doe's primary care physician, Donna Conkling, M.D., completed The Standard's Attending Physician's Statement.  (AR 574-76.)  Dr. Conkling diagnosed Plaintiff with "severe depression" with the following symptoms: "Insomnia, loss of appetite, weight loss, nausea, inability to concentrate, loss of interest in activities of daily living, worsening headaches."  (Pl. SMF ¶ 31 & AR 574, 576.)  Dr. Conkling's Statement further indicated that she had recommended Doe cease work on February 10, 2012 explaining that "depression is interfering with her ability to function at current position as a lawyer in a busy firm. Patient needs to be out of work immediately to undergo intensive outpatient psychological counseling."  (Pl. SMF ¶ 32; Def. SMF ¶ 22; AR 576.)

On February 14, 2012, Frederick White, Ph.D. completed The Standard's Attending Physician Statement.  (Pl. SMF ¶ 33; AR 570-72.)  His listed diagnosis was ICD Code 296.33, "Major Depressive Disorder, Recurrent" with symptoms of "depressed mood daily, markedly diminished interest/pleasure, hypersomnia, psychomotor retardation, fatigue/energy loss daily,

feeling worthless, suicidal ideation." (AR 570.) His Statement indicated that he had recommended that Doe stop working as of February 6, 2012, noting "situational stressors in workplace described as exacerbating symptoms." (Def. SMF ¶ 21 & AR 572.) With respect to Doe's prognosis as of that date, Dr. White indicated that her condition was "unchanged" and that he was "unable to determine" when her condition would change. He did indicate that her condition was "expected to improve." (Pl. SMF ¶ 34 & AR 572.)

In the months that followed, some improvements in Plaintiff's condition were noted. On February 28, 2012, Dr. Conkling saw Plaintiff and noted that her depression was "a little better." (Pl. SMF ¶ 35 & AR 543.) On March 1, 2012, Dr. Petersen reported that Doe was "making some improvement with counseling, medication and medical leave." (Pl. SMF ¶ 36 & AR 512-513.) On April 10, 2012, Dr. Petersen saw Plaintiff and again noted her improvement and stated that "[s]he does seem to be working toward a better place as compared to back in the fall." (Pl. SMF ¶ 37 & AR 511 (redacted).)

**The First Denial**

In April 2012, the Standard requested additional records from both Doe's employer and her attending physicians. (Def. SMF ¶ 24; AR 263-266 & 798.) The Standard also engaged Dr. Cheryn Grant, a psychiatrist who has previously reviewed claims for The Standard, to review Doe's claim. (Def. SMF ¶ 24 & Pl. Response at Page ID # 156.) In her May 27, 2012 Report, Dr. Grant summarized the materials she reviewed, including office visit notes prepared by Drs. White, Conkling, and Petersen through April 2012. (Def. SMF ¶ 25 & AR 489–94.) Dr. Grant concluded that Doe was impaired by a mental disorder at the time she stopped work, "with the impairment beginning on January 18, 2012." (Def. SMF ¶ 26 & AR 493.) Dr. Grant also observed that all

three attending physicians reported improvements in Doe's condition after she stopped work.

(Def. SMF ¶ 25 & AR 492.)  Dr. Grant concluded that Doe was then no longer disabled:

> Records would indicate that at the time that Ms. [Doe] ceased work, she did have some limitations and restrictions secondary to depressive disorder, but this was fairly short lasting and records have indicated that certainly by March 1, 2012, she was improving, and by her visit with Dr. Petersen on April 9, 2012, there was no longer any evidence of significant depressive symptomology. Therefore by April 9, 2012, there would no longer be any limitations or restrictions.

(AR 492–93.)

The Standard also referred Doe's claim for an evaluation by Jan Cottrell, a vocational case manager.  In her first report, dated April 12, 2012, Cottrell found that Doe's occupation at the time of her claim was that of a "Lawyer" noting that any specialty documentation was lacking in the file.   (Def. SMF ¶ 27 & AR 336–41.)  In a second report, dated April 23, 2012, Cottrell opines that "at least 85% of [Doe]'s gross professional service fee income during the 24 months prior to becoming disabled" was related to Doe's [Specialty Own Occupation].   (Def. SMF ¶ 27, Pl. Response at Page ID # 157 & AR 636–38.)

On June 29, 2012, The Standard's Disability Claim Specialist Aaron Wood denied Doe's claim (the "First Denial") on the basis that "The LTD claim has been denied because Ms. [Doe] does not meet the Group Policy's Definition of Disability beyond the 90 day Benefit Waiting Period."  (Pl. SMF ¶ 38 & AR 225.)  In its First Denial, The Standard found: (1) Plaintiff's "Own Occupation" would be considered that of a lawyer with a [Specialty Own Occupation]; (2) Plaintiff became disabled under the Policy by January 18, 2012; and (3) as of April 9, 2012, Plaintiff would reasonably have been able to return to work with no limitations or restrictions. (Pl. SMF ¶¶ 25 & 39; Def. SMF ¶ 28 & AR 229-231.)

**Plaintiff's First Appeal**

Doe first notified The Standard of her desire for a review of the First Denial in December 2012.  (Def. SMF ¶ 29 & AR 210-11.)  In support of this request for review, Dr. White provided additional treatment notes and a letter, dated December 10, 2012, in which he noted that Doe "continues to grapple with clinically significant symptomology extreme enough to prevent her from being able to properly perform the work responsibilities of her profession." (Def. SMF ¶ 10 & AR 199.)  He also noted, "I fully support her decision to leave her former work environment, and I recommend against her returning to her former work environment in light of the fact that her initial improvements have been clearly linked to her no longer being in that environment." (Id.)

On January 25, 2013, Plaintiff's representative and financial adviser, Joel Davis, with Dr. Petersen's signed endorsement, appealed The Standard's First Denial contesting (1) the January 2012 onset date of disability and (2) the finding that Plaintiff had recovered by April 9, 2012 ("Plaintiff's First Appeal Letter"). (Pl. SMF ¶ 40 & AR 476-477.)  In Plaintiff's First Appeal Letter, Davis argued that The Standard had acknowledged that all of Plaintiff's medical providers indicated improvement since the initial onset of increased symptoms, even though she continued to have significant symptomology and further asserted that "the documented evidence demonstrate[d] that Ms. [Doe]'s inability to perform her work started late November, 2011 (or probably before that date), well before January 18, 2012." (Pl. SMF ¶ 41 & AR 476-477.)  The First Appeal Letter also enclosed the letter from Dr. White, dated December 10, 2012, in which he stated in pertinent part that Doe engaged his services beginning with her initial intake at his office on December 9, 2011.  (Pl. SMF ¶ 42 & AR 478-79.)  Dr. Petersen read and reviewed Plaintiff's First Appeal Letter and "Dr. Frederick White's (Ph.D.) letter of 12/10/12, surrounding [Ms. Doe's]

medical history and current situation" and stated that "I fully concur and agree with the above referenced letter submitted on her behalf."  (Pl. SMF ¶ 43 & AR 477.)

### The Standard's First Appeal Decision

On February 6, 2013, Linda Wheeler, Standard's Senior Benefits Review Specialist, referred Doe's claim for a medical review on appeal with Esther Gwinnell, M.D., a consulting psychiatrist who has done a significant number of reviews for The Standard.  (Pl. SMF ¶ 44; Def. SMF ¶ 32; Pl. Response at Page ID # 157 & AR 475.)  Dr. Gwinnell submitted a report, dated March 6, 2013, based on her review of Plaintiff's claim file and telephone conference with Dr. White. (AR 469-472.)  In pertinent part, Gwinnell's report states:  Doe "appear[ed] to be improved from her initial presentation to Dr. White, but her residual symptoms do appear to be severe enough to prevent her from functioning in her own occupation and not just preventing her from returning to her own specific law firm."  (Pl. SMF ¶ 45, Def. SMF ¶ 33 & AR 469.)  Relying on the record then available and acknowledging that the record reflected Doe's receiving care for her depression in late 2011, Dr. Gwinnell determined that Plaintiff's disability did not start until February 6 or February 9, 2012.  (Pl. SMF ¶¶ 46 & 47; AR 468-472; AR 172-173.)  Although Dr. Gwinnell provided an onset date in early February 2012, Wheeler then found Doe's disability started on January 28, 2012, "the day after she stopped work" and continued thereafter ("The Standard's First Appeal Decision").  (Pl. SMF ¶ 48;  AR 166-168 &170-174.)

In a letter dated March 27, 2013, Wheeler explained that The Standard was approving Doe's claim, albeit with a later disability onset date than the date proposed in Doe's appeal:

> In reviewing the information from November 30, 2011 (the date of Ms. [Doe's] first visit with Dr. Peterson *[sic]* for complaints of significant depression) through the date work hours are last reported (January 27, 2012), we find that but for the exception of the first three days of that time period (November 30, 2011, December 1, 2011 and

December 2, 2011) during which no work hours are reported, and the time period from December 15, 2011 through January 2, 2012 at which time [Ms. Doe] was on PTO, the work hours that are documented equal or exceed 80% or more of the average number of hours that Ms. [Doe] reported working in the first six months of 2011.

(AR 166.)  In a follow-up memo to the file dated March 26, 2013, Wheeler concluded:

While I recognize that the medical records suggests that Ms. [Doe] was experiencing significant symptoms of depression beginning prior to January 18, 2012, the date the Benefits Department apparently accept that she was impaired from work, in considering all of the information in Ms. [Doe's] claim file, I do not find sufficient information that would allow me to establish an earlier date of disability.  I am in fact recommending that based on the above that the claim be incurred on 1/28/2012, the day following her last day worked.

(AR 174.)

As a result of the First Appeal, Plaintiff's Gross Monthly Benefit was calculated using Plaintiff's Employer prior tax year, i.e., 2011.  (Pl. SMF ¶ 49 & AR 153.)

**Plaintiff's Second Appeal**

On May 14, 2013, Plaintiff, through her representative, appealed the disability date determination set forth in The Standard's First Appeal Decision (the "Second Appeal Letter").  (Pl. SMF ¶ 50, Def. SMF ¶ 36 & AR 145-147.)  In the Second Appeal Letter, Davis explained that he had met with Plaintiff several times in December 2011 and attested to her condition:  "She was so unfocused, distraught and depressed that I was concerned about her ability to even drive a car for any distance."  (Pl. SMF ¶ 51 & AR 146.)  Dr. White also wrote in further support of Doe's claim reiterating much of what was set forth in his records and letter of December 10, 2012.  (Pl. SMF ¶ 52 & AR 466-67.)  Dr. White's letter, dated May 22, 2013, included the following:

As I stated in my previous letter to you, Ms. [Doe] engaged my services beginning with her initial intake at my office on December 9, 2011.  I can verify that her disability predates this initial session insofar as her call requesting to be seen for evaluation and treatment occurred early in November, 2011.  Her report on interview during intake stated that she became aware of onset of symptoms no less than one year prior.  She

15

has, since that time period, demonstrated inability to successfully carry out tasks of her professional role as an attorney.  In Ms. Wheeler's March 27, 2013 letter, she incorrectly ascertains January 18, 2012 as the initial onset and date for the beginning of Ms. [Doe's] disability.  The actual and correct date is indeed no later than November 2011.  Examination of Ms. Doe's work records of billable hours and specific activities for the final months of 2011 provides further evidence of her impairment during that time.

. . . .

Ms. [Doe] continues to grapple with significant and disabling symptoms of Major Depressive Disorder, with date of onset in 2011, and she continues to require both psychotherapy and medication to manage her symptoms.

(AR 466-467.)

### The Standard's Second Appeal Decision

On July 23, 2013, Christopher Powers, the Senior Benefits Review Specialist responsible for deciding Plaintiff's Second Appeal, referred Plaintiff's claim for another medical review. (Pl. SMF ¶ 53 & AR 465.)  In an eleven-page memo (AR 453-464), dated August 16, 2013, consulting psychiatrist Deena Klein, MD concluded:

I do not see that there were any limitations and restrictions related to her work activity in 2011 or changes therein, nor that limitations and restrictions were supported prior to January 27, 2012.

(Pl. SMF ¶ 54 & AR 462.)  Dr. Klein's memo does acknowledge that Doe was seen by Dr. White for depression prior to January 27, 2012.[10]  (AR 453-54.)  In response to a specific question regarding whether the records documented a correspondence between Doe's depression and a change in her practice area, Dr. Klein opined:

I would make note that the records of a psychological nature begin on December 9, 2011, with Dr. White's intake, and the change in the work duties is not even mentioned. . . . I do not see that any change in her work practice area is alluded to in these records, so I do not have any information to suggest that she developed severe symptoms that

---

[10] Plaintiff correctly notes that Dr. Klein's report does not contain any references to Doe's November 30, 2011 appointment with Dr. Petersen and instead incorrectly indicates that Dr. Petersen first saw Doe for her depression on January 5, 2012.  (See Pl. SMF ¶ 55 & AR 458.)

16

required a work change.  I would also note that, despite being seen by three
practitioners, she was not taken off of work until February 2012.

(AR 461-62 & Def. SMF ¶ 41.)  While reaching this conclusion, Dr. Klein indicated she had "a

call into Dr. White to get a more clinical update" but dismissed Dr. White's May 2012 letter

supporting a disability onset in November 2011 as "this letter does not contain content but simply

an assertion of his views of her current status in terms of forensic issues."  (Pl. SMF ¶ 56 & AR

458.)

Doe's claim was also sent for another vocational review by Karol Paquette.  (Def. SMF

¶ 38 & AR 588-96.)  Based on her review of Doe's billing records, Paquette found that Doe last

recorded more hours for billable work than for non-billable work in early 2010.  (Def. SMF ¶ 38

& AR 588–96.)  Thereafter, Doe's billable hours gradually shrank, while her non-billable hours

increased throughout 2010 and 2011. (AR 593-94.)  Paquette noted that Doe's billable hours fell

to "the lowest point" when she had ceased being an equity partner (August 2011: 0.70 billable

hours; September 2011: 0.25 billable hours; October 2011: 1.9 billable hours; November 2011: 0

billable hours) with an increase noted in December 2011 (33.5 billable hours).  (AR 594-95.)

Based on these records, Paquette concluded that there was a change in the character of Doe's work

in that she transitioned from billable legal work within her law specialty to working primarily on

non-billable matters, such as serving as an officer of a bar association and attending to research,

drafting, and hearings for *pro bono* cases outside of her specialty. (Def. SMF ¶ 38 & AR 591-93.)

In a subsequent report, Paquette examined whether the vocational requirements of Doe's area of

concentration differed distinctly from the skills and aptitudes required of lawyers generally for the

non-billable work that Doe transitioned into during 2010 and 2011.  (Def. SMF ¶ 39 & AR 582–

85.)  Paquette concluded that they did not:

Overall these activities are consistent and would require the same types of tasks in that they would all involve working with clients in groups or as individuals, participating in meetings, conferences and hearings, doing research on background information related to the topic, preparing for meetings and for strategic planning and new case preparation.

(AR 585.)

On August 21, 2013, Christopher Powers upheld the prior March 27, 2013 decision.  (Pl.

SMF ¶ 57 & AR 127-134.)  With respect to Doe's occupation, the decision of the Administrative

Review Unit's independent review on the second appeal explained:

Because [Doe] continued to work in at least some capacity during the time she was claiming Disability, a detailed evaluation was conducted by a Vocational Case Manager . . . the report of this evaluation noted that around November 2011, Ms. [Doe] had substantially reduced the time billed to clients for her work in the field of [Specialty Own Occupation], and was performing non-billable activities . . . including her work [volunteer work.] However, the information in the file indicates that your client performed these duties on an essentially full time basis through January 2012.

On the basis of this understanding of the information in the file, the Vocational Case Manager concluded that although Ms. [Doe] had not been working in her own specialty area of expertise, [Specialty Own Occupation], after November 2011, she had been continuing to work as a lawyer on a reasonably continuous basis until January 28, 2012. She noted that the aptitudes, temperaments and demands of the occupation of attorney would be consistent across general areas of expertise apart from those of litigators or trial attorneys.

Therefore, while we acknowledge that your client did cease work in her particular area of legal expertise, she continued to work as an attorney on a reasonably continuous basis until January 28, 2012, in a position which would have had substantially similar demands and requirements.

(Pl. SMF ¶ 57 & AR 130-131 (redacted).)  With respect to Doe's documented medical condition

and inability to work as a result of that condition, Powers' letter stated in relevant part:

In a letter dated May 22, 2013, your client's psychologist stated that the onset of Ms. [Doe's] symptoms had begun no later than November 2011.  However, although he described your client's stressors and difficulties, he did not discuss the date he first felt that Ms. [Doe] had been unable to work.

The medical information in the file was reviewed by a psychiatrist physician consultant who . . . noted that at some time in November 2011, your client did have an

increase in her symptoms of depression.  However, she observed that Ms. Doe's obstetrician and psychologist both offered recommended cease work dates in February 2012, and also noted that the records do not document that your client has been referred to a psychiatrist for medication management.  The psychiatrist physician consultant stated that the records indicated that Ms. Doe had been able to function at work despite her symptoms of depression, and offered that it was very common for individuals with chronic depression to continue to work, even when there is suicidal ideation.

. . . .

The physician consultant also noted that despite leaving work with complaints of severe depression, stress and cognitive decline, your client had continued to remain active with her children, traveling overseas with them, refurbishing a farmhouse, and planning a large party, which she felt was difficult to reconcile with significant cognitive difficulties.  In summarizing her report, the psychiatrist physician consultant stated that the records did not support limitations or restrictions which would have prevented your client from working prior to January 27, 2012.

. . . .

We acknowledge that Dr. White has written to advocate for your client's impairment, and offers a November 2011 date as the onset of her symptoms.  However, his letters do not contain statements to address the actual time he felt that Ms. Doe was unable to work as an attorney.  We must therefore give the greater consideration to the weight of the contemporaneous medical documentation and the statements initially provided by your client's treating physicians, who had indicated recommended cease work dates in February 2012.

We also understand that [Ms. Doe] appears to have chosen to change some aspects of her practice in 2011, and that she ceased to be an equity partner at her firm as of August 1, 2011. However, we cannot conclude that doing so supports impairment in itself. It is reasonable to anticipate that there may be a number of possible reasons for an attorney nearing retirement age ([Ms. Doe] was 64 at the time she ceased to be an equity partner of her firm) to seek a change in their practice. As detailed above, we cannot conclude that transitioning away from [her specialty] . . . to other practice areas would require substantially different aptitudes, temperaments or demands as generally found in the practice of law.

On that basis, while we recognize that [Ms. Doe] found her work to be stressful and sought to transition to a different type of practice, this does not correspond to an inability to perform the Material Duties of her Own Occupation on a reasonably continuous basis for any employer. Rather, the weight of the medical documentation in the file reasonably supports that [Ms. Doe] became Disabled as of January 28, 2012. It is our determination that [Ms. Doe] did not meet the Definition of Disability prior to that time.

19

(Pl. SMF ¶ 57, Def. SMF ¶ 42 &AR 131-133 (redacted).)  This August 21, 2013 letter quoted the Policy's partial disability provision, but did not make a determination whether Doe was partially disabled at any time.  (Pl. SMF ¶ 58 & AR 130.)

### Plaintiff's Request for Reconsideration

On August 29, 2014, Plaintiff, now represented by counsel, requested reconsideration of The Standard's Second Appeal Decision and submitted Sworn Statements of Doe (AR 74-77), Dr. White (AR 78-79) and Dr. Petersen (AR 86-87) to address facts relied upon by The Standard in its Second Appeal Decision that were "wrong and/or irrelevant."  (Pl. SMF ¶ 59, Def. SMF ¶ 43 & AR 70.)  These facts were:

• The Standard's exclusive reliance on time sheets (AR 74-75);
• The fundamental difference between the duties of Plaintiff's specialty Own Occupation and her volunteer non-billable time (AR 75);
• The Standard's disregard of the severity of her symptoms throughout 2011, as evidenced by the drop in productivity and income (AR 74-76);
• The Standard's assertion that she served as an officer of an organization in 2011, when she had completed the term in 2009 (AR 75);
• The Standard's reliance upon trips and work on a farmhouse that all occurred *after* the time Standard ultimately found her to be disabled (AR 76 & AR 458);
• Standard's statement that Dr. White did not assess functionality in 2011 (AR 78-79);
• Standard's reliance upon the Attending Physicians' Statements recommended stop work date (AR 79, 87); and
• The Standard's disregard of the emotional difficulty Doe experienced when deciding to leave the firm.

(Pl. SMF ¶ 60 (with pin citations as noted).)  Responding by letter dated September 16, 2014, The Standard refused to consider these materials submitted by Plaintiff on the bases that the Second Appeal Decision represented the one administrative review to which Doe was entitled and the materials were submitted more than a year after that decision.  (Pl. SMF ¶ 61, Def. SMF ¶ 45 & AR 67-68.)

Ultimately, The Standard found Plaintiff to be totally disabled under the Policy from January 27, 2012 through April 27, 2014 (the "Undisputed Period of Disability"). (Pl. SMF ¶ 10 & AR 166-68.)    During this Undisputed Period of Disability, The Standard actively sought evidence of continuing disability due to depression, and found Plaintiff met the relevant definition of disability at all relevant times. (Pl. SMF ¶ 11 & AR 26-29.) Thus, the Company paid benefits for the maximum benefit period of 24 months from April 27, 2012 to April 26, 2014 based on Doe's 2011 Predisability Earnings. (AR 26.)

## III.    DISCUSSION

In this case, the parties do not dispute that the Policy provides a clear grant of discretionary authority to The Standard. (See Pl. Mot. (ECF No. 33) at 2-3; Def. Mot. (ECF No. 32-1) at 3, 12-13.) Upon review of the "Allocation of Authority" section of the Policy, it is clear that the language unambiguously provides The Standard with discretionary decisionmaking authority. See AR 384. Cf. Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc., 813 F.3d 420, 428 (1st Cir. 2016) (holding that "a grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that *unambiguously* indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances.") Thus, the Court applies the "arbitrary and capricious" lens in reviewing the denial of benefits challenged here.

Plaintiff argues that Defendant was arbitrary and capricious in determining that Plaintiff was not disabled by her depression until 2012. This decision regarding the disability onset date resulted in Doe receiving significantly lower disability payments for her 24-month benefit period,

since such payments are based on her earnings for the prior tax year.[11]  Plaintiff alternatively asserts that The Standard abused its discretion by not evaluating whether she was partially disabled in 2011.  Finally, Doe suggests that she should have been allowed to pursue an additional administrative appeal in 2014.  The Court considers each of these arguments in turn.

### A.  Date of Disability Onset

Undeniably, evidence in the record shows that Doe was suffering from major depression prior to January 28, 2012, with documentation of reported symptoms in November 2011, self-reported symptoms for a year prior to November 2011, and evidence that Doe had been taking anti-depressants since 2006.  Quite simply, the administrative record can be read to support a disability onset date that was any time between November 2011 and February 2012.  However, given the standard of review, the only question that must be resolved by this Court is whether January 28, 2012, the date that Defendant ultimately set as Doe's disability onset date, is "supported by substantial evidence in the record."  Colby, 705 F.3d at 61 (internal quotation and citation omitted).

Given that deferential standard, the Court readily finds that substantial evidence in the record supports Defendant's decision to set Doe's disability onset date as January 28, 2012.  The substantial evidence includes: (1) Doe's documented completion of a combination of billable and unbillable work through January 27, 2012; (2) contemporaneous documentation from all three of Plaintiff's attending physicians evincing a recommendation that Doe stop work as of early

---

[11] Because of the wording of the Plan's provisions regarding predisability earnings, Plaintiff can only obtain higher disability benefits based on her 2010 earnings if her disability onset date is set at December 31, 2011 or earlier. Plaintiff arguably seeks a determination that Defendant's January 28, 2012 onset date is arbitrary.  However, the Court notes that she would only be entitled to additional payments under the terms of the Plan if the onset date is set before January 1, 2012.

February 2012; and (3) all three of The Standard's consulting physicians concluding that the medical records supported that Doe became unable to work in early 2012.

With respect to the reliance on Doe's documented work hours, the Court acknowledges that Doe's work hours alone are not conclusive proof of a disability.  See, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003) ("A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.")  However, the plan administrator is certainly entitled to consider documented work hours in determining the onset of disability date and, in this case, the record as a whole supports that documented work hours were one of many factors considered by Defendant.

Ultimately, Defendant's August 21, 2013 decision relied on the assessment conducted by the vocational case manager, who concluded "that although [Doe] has not been working in her own specialty area of expertise . . . after November 2011, she had been continuing to work as a lawyer on a reasonably continuous basis until January 28, 2012." (AR 130-31.)  The August 21st decision then goes on to explain:

> Therefore, while we acknowledge that [Doe] did cease work in her particular area of legal expertise, she continued to work as an attorney on a reasonably continuous basis under January 28, 201[2], in a position which would have had substantially similar demands and requirements.  On that basis, we evaluated whether the medical information in the file supported impairment from working as an attorney within the scope of her license to practice law at any time prior to January 28, 2012.

(AR 131.)

To the extent Plaintiff argues that the plan administrator was arbitrary and capricious in its consideration of Doe's non-billable work, the Court disagrees.  Under the Plan, Plaintiff's benefits were triggered if Doe was "unable to perform the material duties" of a lawyer in her area of specialty "as a result of" her depression.  By contrast, benefits are not triggered simply if Doe was

23

not performing the material duties of a lawyer in her area of specialty because she was instead performing other admirable, *pro bono* legal work, and thereby using similar skills and aptitudes that she applied when working as a lawyer in her specialty area.

In responding to Plaintiff's argument regarding non-billable work outside Doe's specialty, Defendant notes that "the record reveals many reasons, other than disability, which may have influenced her shift to non-billable work—the approach of retirement age, the change in partnership status, the reported stressfulness of her job, not to mention the changing market for legal services and other factors."  (Def. Response (ECF No. 34) at 8; see also Def. Motion (ECF No. 32-1) at 15.)  Given many other documented reasons that appear to have contributed to Doe's shift to non-billable work in 2011, the Court cannot conclude that it was an abuse of discretion for Defendant to have considered Plaintiff's non-billable work when it was weighing her documented work hours as a factor in setting her disability onset date, nor does the Court see how the Defendant's construction of Doe's specialty occupation was arbitrary and capricious.  See, e.g., Tsoulas v. Liberty Life Assur. Co. of Boston, 397 F. Supp. 2d 79, 97 (D. Me. 2005) (explaining how occupations are generally evaluated "in light of the usual duties of that occupation, not on ad hoc peculiarities of a specific job or the requirements of a particular employer"), *aff'd*, 454 F.3d 69 (1st Cir. 2006).  To the extent that Plaintiff argues that "billable, client work [in Doe's area of specialization] is more stressful and demanding" than the *pro bono* work she had undertaken, the Court disagrees with that assertion and concludes that it was not arbitrary and capricious for the insurer to have determined that the *pro bono* work would have involved similar skills.

In urging this Court to view Defendant's construction of Plaintiff's attorney occupation as arbitrary and capricious, Plaintiff draws the Court's attention to Whitley v. Standard Insurance Co., 90 F. Supp. 3d 839 (D. Minn. 2015), a case in which the district court found that The Standard

acted arbitrarily and capriciously in determining the specialty of a physician insured.  (See Pl. Response (ECF No. 35) at 7-8.)  More specifically, in Whitely, the district court confronted an insured who was a doctor with a head injury who asserted that her LTD benefits under her Standard policy were prematurely terminated because she was evaluated with an occupation of "family physician" rather than her actual specialty of emergency room physician.  Id. at 845-46.  While this was a meritorious argument before the district court, the Eighth Circuit has since reversed this district court decision, holding that The Standard's decision to terminate Whitely's benefits was not an abuse of discretion and that the district court's decision to the contrary was "inconsistent with abuse of discretion review."  See Whitley v. Standard Insurance Co., 815 F.3d 1134, 1141 (8th Cir. 2016).[12]

Turning to the documented opinions of Plaintiff's own attending physicians, Plaintiff argues that those opinions were disregarded and misinterpreted in setting Doe's disability onset date.  The Court initially notes that Plaintiff first saw Dr. Conkling, her primary physician, about her depression on February 8, 2012.  Thus, there is nothing about Dr. Conkling's treatment records that mandate a determination that Plaintiff was disabled by her depression before January 1, 2012. Plaintiff did see Dr. White and Dr. Petersen repeatedly in late 2011.   However, the contemporaneous notes from Doe's 2011 visits with these two providers do not provide substantial evidence that Doe was disabled from working.  The 11/30/11 Petersen Record indicated only that Dr. Petersen has "strongly advised counseling," prescribed an increased dose of citalopram, and wanted to see Doe back in one month.  (AR 521.)  Dr. Petersen then next saw Doe on January 5, 2012.  The 1/5/12 Petersen Record clearly documents "pretty severe depression," but also indicates that Doe declined an offer of hospitalization and that Dr. Petersen, along with Dr. White, did not

---

[12] The Court notes that the Eighth Circuit decision was issued on March 4, 2016, after the briefing in the present case was complete.

feel she was a candidate for involuntary hospitalization.  There is a notation that Doe reported that the increased medication has "kept her going" and no discussion of Doe's inability to work.  (AR 518.)   Besides Dr. Petersen, Doe saw Dr. White, her attending psychologist, beginning in December 2011 after calling seeking an appointment in November 2011.  The record includes Dr. White's treatment notes from three visits in 2011—December 9, 12 & 15.  While these notes document serious depression and suicidal ideation, the notes are silent on Doe's inability to work. Additionally, all three attending physicians submitted APS forms in connection with Doe's initial claim for LTD benefits; none of which indicated a recommendation that Doe stop work in 2011.

Plaintiff argues that Dr. White's May 23, 2012 Letter, which asserted that Doe was disabled "no later than November 2011," was disregarded by Defendant.  However, the August 21, 2013 final decision explicitly addresses White's letter and explains that the plan administrator did not find the letter to be as significant as the other evidence in the record in determining the date on which Doe became disabled from working as a result of her depression.  See, e.g., Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) ("Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision."); Jones v. WEA Ins. Corp., 60 F. Supp. 3d 1000, 1015 (W.D. Wis. 2014) (concluding that it was not arbitrary and capricious for insurer to discount a doctor's later certification in light of available contemporaneous medical records).  As Defendant also makes clear in its briefing, it gave greater weight to the contemporaneous notes from Dr. White and Doe's other attending physicians.  (See Def. Response (ECF No. 34) at 4.)

Ultimately, it appears that Defendant considered all of the information received from Doe's three attending physicians (Drs. Petersen, White and Conkling).   Those records were independently reviewed by three consulting psychiatrists (Drs. Grant, Gwinnell and Klein).  In

26

total, these records documenting the assessments of six different professionals do not provide overwhelming evidence that Doe was disabled from working prior to January 1, 2012. Rather, there is substantial evidence in these records to support a disability onset date after January 1, 2012. When that evidence is considered alongside the evidence regarding Doe's documented work hours, the Court finds no basis for concluding that Standard's disability onset date was arbitrary and capricious.[13] Thus, even if, upon *de novo* review, this Court might find Plaintiff's arguments persuasive and conclude that the Administrative Record could support an earlier date for the onset of Doe's disability,[14] Defendant's decision to set Doe's disability date on January 28, 2012 was supported by substantial evidence. See Ortega-Candelaria, 755 F.3d at 20 (explaining that "the question is not which side we believe is right, but whether the administrator had substantial evidentiary grounds for a reasonable decision in its favor") (internal quotations and citations omitted).

### B. Partial Disability

Plaintiff alternatively argues that Defendant abused its discretion in not evaluating whether Doe was "partially disabled" in 2011. However, despite having presented two appeals, Plaintiff points to no evidence in the record that she raised the issue of partial disability during the administrative review process. As a result, she did not exhaust her administrative remedies on the issue of partial disability. Thus, Defendant cannot be faulted for failing to explicitly discuss in its administrative decisions the possibility that Plaintiff was partially disabled prior to January 28, 2012, the date upon which Defendant declared Plaintiff totally disabled.

---

[13] The Court notes that it reaches this conclusion even after giving due consideration and weight to Defendant's inherent conflict of interest given its dual roles as evaluator and payor. See Colby, 705 F.3d at 62.

[14] The Court notes that even under *de novo* review it does not believe that a disability onset date before January 1, 2012 would necessarily be supported by substantial evidence in the Administrative Record.

Moreover, to the extent that the Defendant's final decision can be read to implicitly have found that Doe was not partially disabled prior to January 28, 2012, the Court is satisfied that such a determination does not rise to the level of being arbitrary and capricious.  Under the language of the Plan, for Plaintiff to be "partially disabled" there would need be substantial evidence that Doe was "unable to earn 80% or more of [her] Indexed Predisability Earnings, in that occupation" "*as a result of*" her depression.  (AR 369 (emphasis added).)  The other documented reasons that The Standard pointed to as contributing to Doe's shift to non-billable work in 2011 would apply with equal force to explaining why Doe may have earned less than eighty percent of her indexed 2010 income in the latter half of 2011.

## C.  The Third Appeal

On August 21, 2013, The Standard completed its review of Doe's second appeal and notified her of its decision to uphold the conclusion reached on the first appeal.  Under the review procedure in the Plan, there was an allowance for a single administrative review of any denial so long as such a review is requested within 180 days of receipt of notice of the denial.  (AR 383.) Given these requirements, Doe was not entitled to an additional administrative review of the August 21, 2013 decision, which upheld the prior March 27, 2013 administrative review decision. Moreover, Doe's request for additional administrative review on August 29, 2014 was untimely.

To the extent Plaintiff has urged the Court to hold that Doe's August 2014 appeal must be considered under Maine's "notice-prejudice rule," the Court declines to find that the "notice-prejudice rule" is applicable in the context of this third request for administrative review of an accepted LTD claim.[15]  See, e.g., Tetreault v. Reliance Standard Life Ins. Co., No. CIV.A. 10-

---

[15] The Court additionally notes that Plaintiff first asserted the "notice-prejudice" rule in her Objection to Standard's Motion for Judgment.  See Pl. Response at 11-12.  Given the schedule for briefing the pending cross-motions,

11420-JLT, 2011 WL 7099961, at *10 (D. Mass. Nov. 28, 2011), report and recommendation adopted, No. CIV.A. 10-11420-JLT, 2012 WL 245233 (D. Mass. Jan. 25, 2012) (declining to extend the notice-prejudice rule to ERISA cases).

Given these rulings, the Court concurs with Defendant that the attached additional documentation submitted with the August 29, 2014 request for reconsideration are not part of the administrative record that the Court may consider as part of the substantial evidence that must support the insurer's underlying August 21, 2013 decision.  Thus, the Court has disregarded the substance of those exhibits in reaching its decision. See, e.g., supra notes 6 & 7.

## IV.    CONCLUSION

For the reasons just explained, Defendant's Motion for Judgment on the Record (ECF No. 32) is hereby GRANTED and Plaintiff's Motion for Judgment on the Record (ECF No. 33) is hereby DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 21st day of July, 2016.

---

Defendant has not had the opportunity to respond to this argument.  Thus, the Court would generally deem such a new argument waived based on Plaintiff's failure to raise it in her own Motion for Judgment.